COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Kelsey and Petty
Argued at Richmond, Virginia


ROBERT WAYNE DAWSON, II

                                                         OPINION BY
v.       Record No. 1226-13-2           JUDGE ROBERT J. HUMPHREYS
                                                      MAY 27, 2014

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LANCASTER COUNTY
Joseph E. Spruill, Jr., Judge Designate

Michael L. Donner, Sr. (Dunton, Simmons & Dunton, LLP, on
brief), for appellant.

Rosemary V. Bourne, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Robert Wayne Dawson, II ("Dawson") appeals his conviction of strangulation, in

violation of Code § 18.2-51.6, after a bench trial in the Circuit Court of Lancaster County ("trial

court"). Dawson argues that the evidence is insufficient to prove that the strangulation caused a

wounding or bodily injury to the victim.

## I. BACKGROUND

We review the evidence in the light most favorable to the Commonwealth, the prevailing

party in the trial court. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786

(2003). In this light, the evidence established the following.

In July 2012, Dawson was living at the Knight's Inn hotel in Richmond with his

girlfriend and their young child (collectively, "the family"). Knight's Inn was forcing the family

to leave due to lack of funds. Dawson called his mother, Penney Pittman ("Pittman"), the victim,

and told her this news and that the family was going to live in a tent in the woods. Pittman drove

PUBLISHED

from Lancaster County to pick up the family on July 25, 2012. Pittman and the family arrived at Pittman's home in Lancaster County in the early evening of July 25. The family spent the night at Pittman's house, and Pittman washed the family's clothes from 6:00 p.m. until 6:00 a.m. on July 26.

Around 10:00 a.m. on July 26, Pittman informed Dawson that he could not stay on her property and he became upset. Dawson started cursing his mother and blaming her for their homelessness. Pittman was holding the child as Dawson was working himself up and yelling at Pittman. Dawson took the child and put him outside on the back deck. As Pittman was trying to go past Dawson to get the child, Dawson started grabbing her upper arms. Pittman pushed Dawson's chest to get away from him. Dawson grabbed Pittman several times—grabbing her arms, shoulders, and shirt—and then he hit her in the face. Pittman told Dawson to stop, and she turned away from him because the child was watching.

Once they were on the back deck, Dawson yanked Pittman's wrist down to the deck and spun her so that he was behind her and her back was physically touching his chest. His right hand was holding her right wrist and he pinned her hand into the side of her neck and squeezed her neck with the muscle from his right arm. Meanwhile, he "slammed" into her chest with his left hand. "It knocked the breath out of me. [A]t that point, I could hear my heart beat in my head because I couldn't breathe anymore. I didn't. Everything started going black." Pittman continued, "I started to hear my heart beat very loudly. There was pressure on the side of my neck, on both sides." She reiterated that the pressure was from her hand that Dawson was holding beside her neck on one side and from his upper right arm muscle on the other side. Pittman felt like she was "drowning without water" because of the pressure inside of her head, and her heartbeat was getting louder and louder.

- 2 -

Pittman believes she lost consciousness, but she could not say for certain.  She remembered reaching for Dawson's girlfriend, who backed away, and then the next thing she knew is that she was on her knees as if Dawson had just dropped her there on the deck beside the picnic table.  Once she realized she was down on the deck, she saw blood on her hands and she had a pain in the left side of her chest.  At first she thought she had been stabbed.  She felt the deck shaking as she was trying to get her "wits together."  As she started to turn, she saw Dawson coming towards her with his right hand raised.  He was walking fast and hard towards her while she was still on her knees holding on to the picnic table and trying to get up.  Dawson hit Pittman in the back of her head, and her face hit the deck railing.  Dawson went inside the house for a few seconds and then came back out, yelling at Pittman again.

While waiting for help to arrive, Pittman noticed that her nose was bleeding and that physically she was in a "pretty bad situation."  She was also bleeding inside of her mouth on the same side that her face hit the railing.  Her arms and chest were hurting.  "The sides of my neck were actually hurting.  I just – my ribs were hurting."  "I was hurting from my neck to my ankles."  Later that day, Pittman's bruises started to appear.  She had bruises on her upper arms and lower arms, a large bruise on her chest, a bruise on her left torso, and bruises all the way down both of her legs.

The day after the incident, Pittman's friend took her to the Chesapeake Medical Group where nurse practitioner Christine Collins ("Collins") examined her.  Collins testified that Pittman "had contusion-type wounds about her face.  She had injuries about her neck.  She had chest wounds.  She had bruises on her legs[,] [b]ruises on her arms . . . and sort of a dark red ligature-type wound around her neck."  On cross-examination, Collins again testified that Pittman had a dark red bruise on her neck.  There was no break in the skin on Pittman's neck.

Collins was suspicious that Pittman had a rib fracture and head injuries so she sent Pittman to Rappahannock General for X-rays. X-rays showed that Pittman sustained a fracture to the rib.[1] Pittman received several prescription medications for her pain. Pittman returned to see Collins two days later, and Pittman was transferred to the Medical College of Virginia where she was admitted for four days with post-concussive syndrome and post-traumatic stress symptoms. Pittman did not have any lasting effect from the injuries around her neck.

Without elaborating on its findings of fact, the trial court found Dawson guilty of assault and battery and strangulation. Dawson does not contest his assault and battery conviction on appeal.

## II. ANALYSIS

Dawson's assignment of error is:

> The circuit court erred in finding the evidence sufficient to convict the defendant/appellant, Robert W. Dawson, II, ("Dawson") in Indictment No. CR12-238 (violation of Va. Code § 18.2-51.6) by ruling "I do believe the evidence supports that charge," because the Commonwealth's evidence was insufficient as a matter of law to prove that any strangulation caused a wounding or bodily injury to Pittman, the victim.

When the sufficiency of the evidence is challenged on appeal, we must "'examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it.'" Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011) (quoting Vincent v. Commonwealth, 276 Va. 648, 652, 668 S.E.2d 137, 139-40 (2008)). We review the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia,

---

[1] The parties stipulated to the evidence that the physician's reading of the X-ray indicated a recent injury to the rib but not the cause of the injury itself.

443 U.S. 307, 319 (1979)). "Furthermore, we 'accord the Commonwealth the benefit of all inferences fairly deducible from the evidence.'" Brooks v. Commonwealth, 282 Va. 90, 95, 712 S.E.2d 464, 466 (2011) (quoting Glenn v. Commonwealth, 275 Va. 123, 130, 654 S.E.2d 910, 923 (2008)).

Code § 18.2-51.6, enacted in 2012, provides that, "Any person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation, a Class 6 felony." Pertinent to this appeal is the interpretation of the terms "wounding" and "bodily injury." While these terms are not defined in the statute, they have been interpreted as used in other statutes in the Virginia Code, particularly the malicious wounding statute, Code § 18.2-51,[2] to which this Court may look for guidance. See King v. Commonwealth, 2 Va. App. 708, 710, 347 S.E.2d 530, 531 (1986) ("The validity of using other Code sections as interpretive guides is well established. The Code of Virginia constitutes a single body of law, and other sections can be looked to where the same phraseology is employed.").

"[T]o prove the existence of a 'wound,' the Commonwealth must show that the victim's skin was broken or cut." Johnson v. Commonwealth, 58 Va. App. 303, 317, 709 S.E.2d 175, 182 (2011) (citing Johnson v. Commonwealth, 184 Va. 409, 413, 35 S.E.2d 594, 595 (1945)). Here, it is uncontested that any breaks in Pittman's skin, or "wounds," were caused by Dawson's battery of Pittman and not the act of strangulation. Therefore, the only issue before us is whether the evidence was sufficient to show that Pittman suffered a "bodily injury" as a result of Dawson applying pressure to her neck.

---

[2] Code § 18.2-51 provides in relevant part, "If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony."

Neither Code § 18.2-51 nor Code § 18.2-51.6 defines bodily injury. "[C]ourts have been reluctant to give juries a definition [of bodily injury] because the phrase has an 'everyday, ordinary meaning.'" Luck v. Commonwealth, 32 Va. App. 827, 832, 531 S.E.2d 41, 43 (2000) (quoting Stein v. Commonwealth, 12 Va. App. 65, 69, 402 S.E.2d 238, 241 (1991) (interpreting bodily injury under Code § 18.2-51.1, malicious bodily injury to law-enforcement officers)).[3] "'Bodily injury comprehends, it would seem, *any bodily hurt* whatsoever.'" Id. at 831, 531 S.E.2d at 43 (quoting Bryant v. Commonwealth, 189 Va. 310, 316, 53 S.E.2d 54, 57 (1949)) (emphasis in original).

In Luck, two state troopers were treated in the hospital after the appellant's vehicle collided with their vehicle. One trooper suffered stiffness for four to five days and took prescription medication for his low back pain. The other trooper "had similar injuries," also suffering from back pain. Id. at 831, 531 S.E.2d at 42-43. This Court held that

> [t]he evidence permits the finding that the two troopers suffered bodily injury when they received soft-tissue injuries that required medical treatment and caused pain and stiffness. If those injuries did not meet the requirements for bodily injury, we would have the anomaly of an "everyday, ordinary" phrase having different meanings in criminal law and tort law.

Id. at 832, 531 S.E.2d 43.

In Campbell v. Commonwealth, 12 Va. App. 476, 405 S.E.2d 1 (1991) (en banc) (superseded on other grounds), this Court found that there was sufficient evidence to uphold appellant's conviction under Code § 18.2-51 when he beat his three-year-old stepson with a belt. While appellant did not break the toddler's skin, there was "no question that the [appellant] caused his stepson 'bodily injury.'" Id. at 483, 405 S.E.2d at 4. The child had bruises on his

---

[3] This Court said in Stein, "It is a basic rule of statutory construction that a word in a statute is to be given its everyday ordinary meaning unless the word is a word of art." Stein, 12 Va. App. at 69, 402 S.E.2d at 241.

legs, back, and shoulders—the child's mother was shocked when she discovered the bruises, and the child's grandmother "went frantic" when she saw them. The grandmother arranged for the child to go to the hospital where photographs were taken. Id. at 482, 405 S.E.2d at 3-4. While appellant argued that there must be a breaking of the skin to constitute malicious wounding, this Court held that "the statute has been more broadly interpreted to include any bodily injury." Id. at 483, 405 S.E.2d at 4 (citing Bryant, 189 Va. at 316-17, 53 S.E.2d at 57).

More recently in English v. Commonwealth, 58 Va. App. 711, 715 S.E.2d 391 (2011), this Court again emphasized that it gives the phrase "bodily injury" its "'everyday, ordinary meaning,'" "which needs no technical, anatomical definition." Id. at 718, 715 S.E.2d at 395 (quoting Luck, 32 Va. App. at 832, 531 S.E.2d at 43). The phrase includes "'any bodily hurt whatsoever.'" Id. (quoting Bryant, 189 Va. at 316, 53 S.E.2d at 57). "It includes any 'detriment, hurt, loss, [or] impairment' that could fairly be considered an injury to the human body." Id. at 718-19, 715 S.E.2d at 395 (quoting Johnson, 184 Va. at 416, 35 S.E.2d at 596). "To prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin. Nor must she offer proof of 'broken bones or bruises.'" Id. at 719, 715 S.E.2d at 395 (quoting Luck, 32 Va. App. at 831-32, 531 S.E.2d at 43). "[I]nternal injuries—no less than external injuries—fall within the scope of Code § 18.2-51." Id.

In this case, Pittman testified that Dawson applied pressure to her neck by pinning her hand to one side of her neck and squeezing the other side of her neck with his arm muscle. She was initially standing up when he committed this act. Pittman could not breathe; she described that she felt like she was drowning and everything started going black. She did not remember falling down, but she found herself on her knees. Pittman testified that the sides of her neck hurt, and the nurse practitioner testified that Pittman had dark red bruises around her neck the day following the incident. From this evidence, a reasonable fact-finder could conclude that Dawson

applied pressure to Pittman's neck which impeded her respiration and/or blood flow and that the bruises around Pittman's neck constituted a bodily injury that resulted from Dawson applying pressure to her neck.[4]

## III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

<u>Affirmed.</u>

---

[4] Because the record contains no medical evidence regarding whether Pittman's loss of consciousness had any negative impact on her physical health or well-being, and because the issue has not been briefed, we leave open the question of whether or not loss of consciousness standing alone would constitute a bodily injury as contemplated by the statute.