COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, O'Brien and Russell
Argued by videoconference

**PUBLISHED**

RAE'QUAN XAVIER DANDRIDGE

                                                    OPINION BY
v.        Record No. 0177-20-2                     JUDGE WILLIAM G. PETTY
                                                    JANUARY 12, 2021

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Frederick G. Rockwell, III, Judge

James R. Cooke, Jr. (James River Law, on brief), for appellant.

Liam A. Curry, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Rae'quan Xavier Dandridge argues on appeal that the trial court erred in refusing to give his

proposed jury instruction for the lesser-included offense of voluntary manslaughter.  We agree; we

reverse and remand for a new trial.

## I.  BACKGROUND

"Usually, this Court 'review[s] the evidence in the light most favorable to the

Commonwealth, the prevailing party in the trial court.'"  Lienau v. Commonwealth, 69 Va. App.

254, 260 (2018) (alteration in original) (quoting Dawson v. Commonwealth, 63 Va. App. 429,

431 (2014)), aff'd upon hearing en banc, 69 Va. App. 780 (2019).  "However, '[w]hen reviewing

a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most

favorable to the proponent of the instruction.'"  Id. (quoting Commonwealth v. Vaughn, 263 Va.

31, 33 (2002)).  We must therefore view the evidence in the light most favorable to Dandridge.

On March 19, 2019, fourteen-year-old A.Y. and her friend spent the day "hanging around"

the outside of the Chippenham Apartments complex with sixteen-year-old Dandridge.  After dark,

the girls found Dandridge's mother and asked Ms. Dandridge to take them home. Ms. Dandridge reluctantly agreed. Dandridge brought a gun with him; he always carried the gun with him for protection because both he and his friends had been shot at before. He sat in the back seat behind his mother and put the gun in the seat pocket behind the driver's seat. After dropping the friend off at her house, Ms. Dandridge drove to A.Y.'s home.

Unbeknownst to Dandridge and his mother, the friend's sister had contacted A.Y.'s family to say A.Y. was on her way home; A.Y.'s family was waiting for the Dandridge car. A.Y.'s brother, Elijah Harris, and Harris's friend, ShyHeim Brown, were waiting on the front porch of A.Y.'s unit. A.Y.'s stepfather and mother, Nykiesha Brooks, were waiting in a car in a parking lot across the street from the building. When the Dandridge car stopped in front of A.Y.'s unit, Ms. Dandridge noticed a group of "more than 10 [people] surrounding the car," which made her nervous.

As soon as the Dandridge car arrived, Harris phoned Ms. Brooks, who testified she immediately drove from the parking lot and blocked the Dandridge car in. She testified she "drove in front of the car so they couldn't like, pull off, because I wanted to see who was dropping my daughter off." As A.Y. got out of the Dandridge car, another car pulled behind the Dandridge car, blocking it in from the rear. Harris and Brown had already gone from the porch, around the back of the Dandridge car, to the rear driver-side window by the time Ms. Brooks approached Ms. Dandridge.

Dandridge rolled the window part-way down to see what Harris and Brown wanted. Harris asked what his name was. When Dandridge answered, Harris hit him in the face through the open window, a punch Harris described as a "clean hit." Dandridge immediately put the window up and slid toward the passenger side of the car to get away. Harris ran around the back of the car to the

- 2 -

passenger side, intending to punch Dandridge again. Dandridge yelled to his mother to lock the doors; she was fumbling with her phone and grabbing her heart.

Before Harris could punch Dandridge again from the passenger side, Brown opened the back driver-side door and grabbed Dandridge's leg. A.Y. testified that while Brown was "trying to pull him out of the car," Dandridge was yelling to her "to get them off him." Ms. Dandridge felt the car "rocking" with "a lot of movement going on" as Dandridge was kicking at Brown to get away. Harris saw Brown raise his arm to start swinging at Dandridge. As Harris and A.Y. joined Brown at the open car door, A.Y. warned them that Dandridge had a gun.

Ms. Brooks testified that what happened next "happened so fast," "probably, like, [within] five, six seconds." Dandridge testified that when Brown leaned into the car to drag him out, Brown immediately saw the gun in the seat pocket. They both grabbed for the gun, but Dandridge got the gun first by jerking his arm away from Brown. Dandridge slid away from the door and pointed the gun at Brown, who was still in the doorway of the back seat. Brown looked at Dandridge a moment and then lunged toward Dandridge, partially entering the car. While shooting four shots, Dandridge heard someone shout, "get the gun," and saw Brown come towards him.

Ms. Brooks was standing next to Brown, on the driver side of the open door. Ms. Brooks saw Dandridge fire the shots. She described Dandridge as "still sitting in the car" and he tried to "shoot the gun outside the car, like, leaning towards out of the car." For the last shot, Dandridge "had the gun around the car, the back side of the car." Dandridge testified that while leaning out of the car and pointing toward the rear with the right hand, he was trying to close the car door with the left hand. Dandridge told police that he thought it was the final shot that hit Brown because he saw Brown slightly jerk and push A.Y. The bullet entered Brown's right chest and traveled through the left upper arm. A.Y. saw Brown running beside her and holding under his arm until he fell. Dandridge yelled at his mother to lock the car door and leave. His mother was finally able to leave

- 3 -

because someone moved Ms. Brooks's car far enough out of the way that Ms. Dandridge could drive around it.

Dandridge testified he did not know Brown and had only seen Harris once. Dandridge testified that during the incident his body was shaking, and his hands were shaking. His heart was pounding and beating fast, and he felt like his chest was shaking. He kept looking at his mother, still in the driver's seat, who had a heart condition and was holding her chest. He was scared.

During a jury trial for first-degree murder and the use of a firearm in the commission of murder, Dandridge requested jury instructions for both the lesser-included offenses of second-degree murder and voluntary manslaughter and for self-defense. The trial court gave the jury instructions on self-defense and second-degree murder but refused the instruction on voluntary manslaughter. The jury convicted Dandridge of second-degree murder and the use of a firearm in the commission of murder.

## II. ANALYSIS

### A. Standard of Review

This Court's standard of review where the trial court refuses a jury instruction is well-established. "As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." Lienau, 69 Va. App. at 264 (alterations in original). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." King v. Commonwealth, 64 Va. App. 580, 586 (2015) (*en banc*) (quoting Gaines v. Commonwealth, 39 Va. App. 562, 568 (2003) (*en banc*)).

> However, "if there is evidence in the record to support the defendant's theory of defense, the trial judge may not refuse to grant a proper, proffered instruction." King, 64 Va. App. at 587 (quoting Foster v. Commonwealth, 13 Va. App. 380, 383 (1991)). . . . The theory, however, must find support in the evidence. "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence." Id. (alteration in original) (quoting Eaton v. Commonwealth, 240 Va.

- 4 -

236, 255 (1990)). "'The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." Id. (omission in original).

Lienau, 69 Va. App. at 264. "Where the conflicting evidence tends to sustain either the prosecution's or defense's theory of the case, the trial judge *must* instruct the jury as to both theories." King, 64 Va. App. at 587 (quoting Foster, 13 Va. App. at 383).

> Phrased differently, "if there is evidence in the record to support the defendant's theory of defense, the trial judge *may not refuse to grant a proper, proffered instruction.*" Consequently, "the trial court must instruct on both theories to guide a jury in their deliberations as to the law applicable to the case, depending upon how the jury decides the facts."

Id.

Moreover, the defendant is entitled to an instruction for a lesser-included offense if a jury could "rationally find the defendant guilty of the lesser offense yet acquit him of the greater." Edwards v. Commonwealth, 65 Va. App. 655, 663 (2015) (quoting Carter v. United States, 530 U.S. 255, 261 n.3 (2000)).

### B.  The Law of Voluntary Manslaughter

Voluntary manslaughter is a lesser-included offense of second-degree murder. "[B]ecause the General Assembly has not statutorily defined the offense of voluntary manslaughter, we must look to the common law." Smith v. Commonwealth, 68 Va. App. 399, 410, aff'd, 296 Va. 450 (2018). See Code § 1-200 ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.").

> In 1769, in his Commentaries on the Laws of England, Sir William Blackstone defined the offense of manslaughter as follows: "Manslaughter is therefore thus defined, the unlawful killing of another, without malice either express or implied: which may be either voluntarily,

upon a sudden heat; or involuntarily, but in the commission of some unlawful act."

Smith, 68 Va. App. at 411 (emphasis omitted) (quoting 4 William Blackstone, Commentaries on the Laws of England *190-91 (1769)). Thus, "[i]n Virginia, criminal homicide is divided into two categories: murder and manslaughter. 'Murder' is the unlawful killing of another with malice. 'Manslaughter, on the other hand, is the unlawful killing of another without malice.'" Canipe v. Commonwealth, 25 Va. App. 629, 642 (1997) (quoting Barrett v. Commonwealth, 231 Va. 102, 105 (1986)); see also Woods v. Commonwealth, 66 Va. App. 123, 131 (2016) ("Second-degree murder, of which the jury convicted appellant, is defined as a malicious killing.").

"[O]ver the last two centuries, 'heat of passion upon reasonable provocation' has evolved into the only currently legally recognized factor in the Commonwealth that negates malice." Smith, 68 Va. App. at 426 (Humphreys, J., concurring). Therefore, "[t]o reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation. Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." Canipe, 25 Va. App. at 643 (internal citations omitted) (quoting Barrett, 231 Va. at 105-06).

"Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." Woods, 66 Va. App. at 131 (quoting Rhodes v. Commonwealth, 41 Va. App. 195, 200 (2003)). "[Heat of passion] excludes malice when provocation reasonably produces fear that causes one to act on impulse without conscious reflection.'" Witherow v. Commonwealth, 65 Va. App. 557, 567 (2015) (quoting Graham v. Commonwealth, 31 Va. App. 662, 671 (2000)); see Miller v. Commonwealth, 5 Va. App. 22, 25 (1987) ("Heat of passion may result when one is provoked to fear or rage or both."). Accordingly, "[v]oluntary manslaughter is the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out

of the quarrel, or combat, or provocation.'" Woods, 66 Va. App. at 131 (quoting Wilkins v. Commonwealth, 176 Va. 580, 583 (1940)).

"As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice arising from a homicide is a question of fact" to be decided by the jury. Id. at 131-32 (quoting McClung v. Commonwealth, 215 Va. 654, 656 (1975)). Likewise, "it is also a question of fact whether the defendant committed the homicide before or after his passion had cooled." Miller, 5 Va. App. at 26 (quoting McClung, 215 Va. at 656). "[A] trial court must instruct the jury on the lesser-included offense of voluntary manslaughter if the evidence of heat of passion and reasonable provocation amounts to 'more than a scintilla.'" Turner v. Commonwealth, 23 Va. App. 270, 275 (1996). "It is immaterial that the jury could have reached contrary conclusions. If a proffered instruction finds any support in credible evidence, its refusal is reversible error." McClung, 215 Va. at 657.

### C. The Trial Court Erred in Not Giving the Instruction

Here, the trial court erred in not giving the voluntary manslaughter instruction because there was credible evidence from which the jury could conclude Dandridge acted in the heat of passion upon reasonable provocation, and thereby acted without malice. See Woods, 66 Va. App. at 131.

The evidence showed that Brown and Harris initiated the "sudden quarrel" or "sudden provocation." See id. at 132. Harris delivered a "clean hit" to Dandridge's face through the car window, and Brown tried to drag Dandridge out of the car by his feet. Dandridge struggled to get away from Brown, causing the car to rock and move, and Dandridge yelled to A.Y. for help. During the struggle, Brown grabbed for the gun, but Dandridge got the gun first. Within seconds, Dandridge fired four shots out of the car, the last of which was aimed toward the rear of the car as Dandridge was trying to close the door with his other hand. During those moments, Dandridge heard someone yell "get the gun" and saw Brown move toward him. Dandridge testified he was

afraid for both himself and his mother, who was clutching her chest. Based on these facts, the jury heard credible evidence by which, if believed, it could have found the killing resulted from a "provocation [that] reasonably produce[d] fear that cause[d] [Dandridge] to act on impulse without conscious reflection." Witherow, 65 Va. App. at 567.

Here, the trial court gave an instruction on self-defense. In doing so, it acknowledged that there was sufficient credible evidence that Dandridge was in fear of death or bodily injury. We note that

> [i]f fear was adequately and in fact provoked, but is insufficient for self defense, the resultant killing is voluntary manslaughter. Thus, it seems the fearful killer is a manslaughterer when his fear is produced by facts insufficient to make him a self-defender, *e.g.,* the deadly response was unnecessary or the fear was unreasonable.

Couture v. Commonwealth, 51 Va. App. 239, 249 (2008) (quoting Ronald J. Bacigal, Criminal Offenses & Defenses in Virginia, Homicide, 358-59 (2007–08 ed.)). Because of this close relationship between self-defense and voluntary manslaughter, it would be an unusual scenario in which the minimum quantum of evidence supports a self-defense instruction but not a voluntary manslaughter instruction. Therefore, the trial court's approval of the self-defense instruction supports our conclusion that there was more than a scintilla of credible evidence that the killing was not done with malice, and the voluntary manslaughter instruction was thereby required.

Moreover, the jury's rejection of Dandridge's self-defense theory in this case does not preclude its consideration of a voluntary manslaughter theory. "The plea of self-defense and of passion . . . are not in conflict with each other." McClung, 215 Va. at 657 (quoting Wilkins, 176 Va. at 583). "In the context of homicide law, fear can be 'adequately and in fact provoked' to demonstrate heat of passion, but nevertheless be 'insufficient for self defense.'" Witherow, 65 Va. App. at 569 n.4 (quoting Ronald J. Bacigal, Virginia Practice: Criminal Offenses and Defenses, Homicide, 365 (2015–16 ed.)). It is "immaterial that the jury did not believe that the

- 8 -

defendant killed in self-defense as defined in the instruction they heard. Had the jury been instructed in the definition of voluntary manslaughter, they could have found that the homicide met that definition." McClung, 215 Va. at 657. When "there is evidence tending to support the lesser offense," it is for "[a] jury, not the trial court, [to] weigh[ ] the evidence and assess the credibility of the witnesses" in seeking to determine whether fearful actions were reasonable to justify self-defense, or imperfect, but still negating malice." Witherow, 65 Va. App. at 569 n.4 (alterations in original) (quoting Barrett, 231 Va. at 107).

The Commonwealth argues that the evidence, even when viewed in the light most favorable to Dandridge, precludes heat of passion because Dandridge leaned out of the car to fire the fatal shot. We disagree. The firing of the four shots, including Dandridge's leaning out to fire the last shot, took only moments. Additionally, Dandridge testified he was trying to close the door to get away at the same time the last shot was fired, that he had heard someone yell "get the gun," and that he had seen Brown move toward him. It was for the jury to determine if leaning out of the car was done during the heat of passion or done with a sedate mind. See Canipe, 25 Va. App. at 642.

The Commonwealth argues that, as in Woods v. Commonwealth, the undisputed forensic evidence precludes a voluntary manslaughter instruction. In Woods, "the physical evidence affirmatively show[ed] that appellant exerted great care in aiming at the victim and in shooting him, which contradict[ed] appellant's theory that his reason was overcome by fear." Woods, 66 Va. App. at 133. In Woods, the appellant shot ten times and hit the victim every single time, even while appellant changed position and the victim was a moving target. Id. at 134. The Commonwealth argues here that because the bullet travelled laterally from the right side of Brown's body to the left side, the undisputed forensic evidence conclusively established malice because the victim was not even facing Dandridge at the time that Dandridge shot and killed him. We disagree that Woods is dispositive here. In contrast to Woods, the forensic evidence

does not "affirmatively show" that Dandridge used a sedate, calm mind or exerted great care while shooting. Nor does it conclusively show whether Brown was shot while turning toward Dandridge, while turning away from Dandridge, while pushing A.Y. out of the way, or while fleeing. It was for the jury to determine whether Dandridge acted with or without malice.

### D. The Trial Court's Error Was Not Harmless

"Concluding that the trial court erred, however, does not end our analysis." Lienau, 69 Va. App. at 270. "Code § 8.01-678 makes 'harmless-error review required in all cases.'" Commonwealth v. White, 293 Va. 411, 420 (2017). "Non-constitutional error is harmless if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude the error 'failed to have any "substantial influence" on the verdict.'" Lienau, 69 Va. App. at 270 (quoting Bell v. Commonwealth, 47 Va. App. 126, 140 n.4 (2005)). "[W]here it is impossible to determine from the verdict whether the jury would have necessarily rejected a lesser-included offense on which it was not instructed, error in refusing to instruct on that offense is not harmless." Id. Here, we cannot determine whether the jury would have rendered a different verdict if it had been instructed on voluntary manslaughter.[1] It was therefore error for the trial court to refuse the jury instruction on voluntary manslaughter. Woods, 66 Va. App. at 132.

### III. CONCLUSION

Viewing the facts in the light most favorable to the proponent of the voluntary manslaughter jury instruction, there was credible evidence that Dandridge was provoked to fear or anger, or both, by the victim's initial attack in the car and Dandridge's perception that the victim was coming to

---

[1] It is apparent that the jury had problems with the evidence proving malice. The jury asked the court the following question: "if we have reasonable doubt malice exists, does deliberate use of a deadly weapon constitute malice?" The court responded as follows: "review the jury instructions. This is all addressed in here. Just review the jury instructions, okay? I can't give you any more than that." A juror then asked for a dictionary so they could "look up the exact definition of inferred." They were not given a dictionary.

attack again. The trial court should have instructed the jury on voluntary manslaughter as Dandridge requested, and it was the jury's purview to determine if the last shot fired was done so with malice or with heat of sudden passion. We reverse the convictions and remand for a new trial if the Commonwealth be so inclined.

Reversed and remanded.