PRESENT:  All the Justices

COMMONWEALTH OF VIRGINIA

v.  Record No. 240294

LUKA KARTOZIA

OPINION BY
CHIEF JUSTICE S. BERNARD GOODWYN
JUNE 5, 2025

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the circuit court erred in denying a jury instruction, proposed by the defendant, regarding a good-faith claim-of-right defense to a trespassing charge.

I. BACKGROUND

Just after midnight on February 23, 2022, security guard Herman Austin observed Luka Kartozia near a back entrance of Turnberry Tower, a condominium high rise.  Kartozia's presence there was unusual for several reasons: it was approximately 12:05 a.m. on a Wednesday, the front entrance of Turnberry Tower has a concierge to assist visitors, the back entrance to Turnberry Tower is reserved for use by residents with keycard access, and Kartozia was "acting erratic . . . doing squats" and "pacing . . . back and forth" in a garden area utilized as a resident dog park.  Kartozia was also using a nearby Turnberry Tower outside power outlet to charge his cell phone.

Austin approached Kartozia and informed him that he was on private property and needed to leave unless he was a resident of Turnberry Tower.  When Kartozia did not respond, Austin inquired whether Kartozia knew anyone who resided at Turnberry Tower.  Kartozia stated that he did know a resident named Phil Yang.  Austin then offered to contact Yang for Kartozia, and explained that Kartozia was not permitted to "just loiter" and "stand around."  Kartozia declined Austin's offer to contact Yang.

Austin left Kartozia and went to inform his supervisor, Eric Walker, of his interaction with Kartozia. Together, Walker and Austin subsequently approached Kartozia, who was still in the garden area. Walker asked Kartozia, "[A]re you here for someone? We can call them. If not, you have to leave."

Kartozia responded, "[W]hy are you so mad?" Walker again told Kartozia, "[S]ir, if you're here for someone, we'll call them. If not, you're going to have to leave the property." Kartozia did not state that he was visiting anyone, nor did he accept Walker's offer to contact a resident. Instead, Kartozia replied, "[D]o what [you] have to do."

Walker called the Arlington Police Department, informing dispatch that there was a trespasser on the premises of Turnberry Tower. At approximately 1:30 a.m., Arlington Police Officer Nigel Reed and his partner arrived at Turnberry Tower and spoke with the Turnberry Tower security officers. They informed the police officers that Kartozia had been asked to leave the premises multiple times.

Officer Reed and his partner approached Kartozia and explained to him why they were there and that Turnberry Tower security wanted him to leave. The officers asked Kartozia several times why he was there. Kartozia eventually responded that he was visiting a friend. The officers then asked Kartozia to contact the resident he claimed to know. Kartozia told them that it "wasn't his responsibility" to contact the resident, and "[s]ecurity should do it." Kartozia unplugged his telephone and told the officers that he had the contact information for the resident he claimed to know, Yang, in his phone. Kartozia then asked if it would help if he contacted Yang. When Officer Reed responded "Yes," Kartozia replied that he "wasn't going to do that."

The police officers asked Kartozia to leave the Turnberry Tower property "[a]t least six or seven times," but Kartozia refused. He was "uncooperative with every opportunity" and

2

called the officers explicit sexual slurs. Kartozia never contacted, or attempted to contact, Yang, nor did he do anything else to initiate visiting with Yang or any other resident of Turnberry Tower.

After informing Turnberry Tower security staff that Kartozia "was not willing to leave" and confirming that authorized security staff wanted to pursue trespass charges against Kartozia, because of Kartozia's refusal to leave the premises, Officer Reed placed Kartozia under arrest.

Kartozia was charged with trespassing in violation of Code § 18.2-119 and was found guilty in the Arlington County General District Court. He appealed his conviction to the Arlington County Circuit Court for a trial de novo.

At trial in the circuit court, the Commonwealth presented testimony from security guards Austin and Walker, and from Officer Reed. Walker explained that Turnberry Tower requires unaccompanied visitors to come to the main entrance at the front of the building. Visitors must then inform the concierge which resident they are there to see, and the concierge will use a "building link" system to contact the resident and let them know that they have a visitor that they need to come meet. Walker testified that Kartozia did not come through the main entrance of the building or speak with the concierge on the night in question. Further, if he was there as a visitor, Kartozia did not, at any point, accept Walker's offer to contact the resident Kartozia claimed to know and was allegedly there to visit.

Kartozia called Yang to testify in his defense. Yang confirmed that he resides at Turnberry Tower and knows Kartozia. Yang stated that Kartozia had visited Yang "five to six" times in the last three or four years. Yang testified that he was home on the night of February 23rd, but that neither Kartozia nor anyone else contacted him about Kartozia's presence on the property. He had no idea that Kartozia was there.

3

On cross-examination, Yang admitted that "the normal procedure" when visitors come to visit is to "come to the front desk to check in . . . . and let whoever is sitting there know who they're there to visit, [and] . . . then the desk will contact the resident." Yang also testified that, although a visitor may arrive at the premises alone, "the visitor is not just free to be anywhere in Turnberry Tower that they wish." Yang explained that although a visitor may have to wait for "a second" while the resident comes down to get them, it's "not typical" for visitors to "wander around" the property unescorted.

Kartozia testified in his own defense. Kartozia stated that he arrived at Turnberry Tower on February 23rd to visit Yang, who he had visited there "many times" before. Kartozia testified that the process for visiting Yang was "different every time," explaining that he "could just pull up and say, Phil, I'm here." Sometimes Yang was hosting a party, allowing Kartozia to walk in, or "[s]ometimes the security [would] call him," and Yang would come down on the elevator to meet Kartozia. On the night in question, Kartozia testified that his phone was dead, and that he was standing in "a seating area with benches and a power outlet" that Kartozia plugged his phone into, "doing yoga and waiting for [his] phone to charge so [he could] hit up Phil."

Kartozia testified that he told security guard Austin that he knew Phil Yang. Regarding what he told the police officers, Kartozia stated:

> [T]hey were asking me questions and I felt as though I didn't have to answer these questions because I knew I was there for Phil. And I told them I was there for Phil. And I said to them, ["I]f you want to contact Phil, make sure that I'm here for somebody, then you go ahead and do that. Otherwise, I have no business with you and you have no business with me. I'm just charging my phone so I can call up there, but I'm not going to call him because you're telling me to call him because I know I'm here and not trespassing. So, if you want to find this out, go ahead. And if you don't and you want to arrest me, then do what you have to do, but there's no basis of you arresting me because I'm not trespassing.["]

4

On cross examination, Kartozia admitted that he did not go to the concierge desk at the front entrance, but instead went around to the back of the building without alerting anyone, including Yang, that he was there to visit Yang. Kartozia also admitted that Yang did not know Kartozia was coming. Kartozia explained that he did not tell Yang he was coming because his phone was dead, but Yang "was to know that" once his phone was back on. Asked whether Kartozia was charging his phone from about midnight until 1:30 a.m., when police officers arrived and told him, as had the security officers, that he needed to call Yang in order to remain on the premises, Kartozia replied in the affirmative, but protested "[t]hat wasn't the point."

After both parties had presented their evidence, Kartozia proposed Instruction H, which stated:

> A good faith belief that one has a right to be on the premises negates criminal intent.

> If you find from the evidence that Mr. Kartozia believed he had a good faith claim of right to enter onto the property, even though this belief was mistaken, you shall find the defendant not guilty of trespass.

> A good faith claim of right is a sincere, although perhaps mistaken, good faith belief that one has a legal right to be on the property. The claim need not be of title or ownership of the property, but it must rise to the level of authorization.

> The Commonwealth objected to Instruction H.

> The circuit court denied Instruction H. The circuit court first noted that "it's not that Mr. Kartozia was initially on the property after having been forbidden, it was a course of conduct where he remained" after being told to leave by two security officers and by police officers. The circuit court also noted that the evidence showed only that Kartozia *knew* a resident, not that he was a resident's guest, and that Kartozia declined to contact Yang, the resident he claimed to know, in order to become an authorized guest.

5

The circuit court found that there was not more than a scintilla of evidence that Kartozia had a good-faith belief that he was authorized to remain on the property after he was told by security and police officers that he was not allowed to remain on the premises, unless he contacted a resident he was there to visit. The circuit court also expressed concern that providing the instruction would confuse the jury.

The jury found Kartozia guilty of criminal trespassing. In accordance with the sentence fixed by the jury, the circuit court imposed a $1,000 fine.

In an unpublished opinion, the Court of Appeals reversed the circuit court's judgment, vacated Kartozia's trespass conviction, and remanded the case for retrial. The Court of Appeals ruled that the circuit court abused its discretion in refusing to give proposed Instruction H because "more than a scintilla of evidence support[ed] Kartozia's claim that he had a bona fide belief that he was rightfully on the Turnberry Tower property." Specifically, the Court of Appeals determined that "the evidence supports a reasonable inference that Kartozia believed in good faith that he was welcome to visit Yang that night without advance notice. Thus, the evidence supported Kartozia's claim that he believed in good faith that he had a right to remain at Turnberry Tower that night." The Court of Appeals stated that the circuit court "failed in its responsibility to ensure that the law was clearly stated for the jury," particularly because the claim-of-right defense constituted a principle of law that was vital to Kartozia in his criminal case.

The Court of Appeals rejected the Commonwealth's contention that, even if the circuit court erred in refusing Instruction H, such error was harmless because Kartozia's claim of right "was clearly negated by the authorized agents directing him to leave the property multiple times." Rather, the Court of Appeals found that "neither security guard gave Kartozia an

6

unconditional directive to leave the property" because the security guards told Kartozia that he had to leave only if he didn't know a resident and was not there for a resident. The Court of Appeals additionally determined that, because "[t]he circuit court's failure to instruct the jury on the claim of right defense deprived Kartozia of his right to acquittal if the jury . . . had a reasonable doubt whether Kartozia believed in good faith that he had a right to remain on the Turnberry Tower property that night[,]" such error "cannot be harmless."

The Commonwealth appealed. We granted three assignments of error:

1. The Court of Appeals erred when it found that the circuit court abused its discretion in denying Instruction H.

2. The Court of Appeals erred in finding that more than a scintilla of evidence was presented when no affirmative evidence was presented on one prong of an affirmative defense.

3. The Court of Appeals erred by applying the incorrect standard of review in its harmless error analysis and further erred in finding that any error was not harmless.

## II. ANALYSIS

The Commonwealth argues that the circuit court properly exercised its gatekeeping function by refusing to provide Kartozia's proffered jury instruction regarding the claim-of-right defense, as the instruction was not supported by more than a scintilla of credible evidence. Specifically, the Commonwealth argues that Kartozia provided no evidence showing that he had a reasonable basis for believing that he was authorized to remain on the Turnberry Tower premises after being asked to leave multiple times. Additionally, the Commonwealth argues that even if directives to leave from security staff and law enforcement were not unconditional, Kartozia failed to meet any of the conditions he was provided. Specifically, Kartozia presented no evidence that he attempted to initiate a visit with Yang although he was on the property for over an hour and a half. In fact, he refused to contact Yang to initiate a visit or receive authorization to remain on the property.

7

We review a circuit court's decision to grant or deny a proposed jury instruction for an abuse of discretion. *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017). "The exercise of judicial discretion presupposes 'that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts – yet still remain entirely reasonable.'" *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Du v. Commonwealth*, 292 Va. 555, 564 (2016)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id*. "In reviewing a trial court's refusal to grant a proffered jury instruction, we examine the evidence in the light most favorable to the proponent of the instruction." *Honsinger v. Egan*, 266 Va. 269, 274 (2003).

We apply the deferential abuse of discretion standard alongside our recognition that "[a] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004). "The purpose of jury instructions 'is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them.'" *Honsinger*, 266 Va. at 274 (quoting *H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 936 (1962)). A reviewing court has a "responsibility to ensure that the law has been clearly stated in the [jury] instructions and that they cover all the issues that the evidence fairly raises." *Howsare*, 293 Va. at 443. Thus, if reasonable jurists could not differ that the "proffered instruction finds [] support in credible evidence, its refusal is reversible error." *Id*. (quoting *McClung v. Commonwealth*, 215 Va. 654, 657 (1975)). To be sufficient, "[t]he evidence presented in support of an instruction 'must amount to more than a scintilla.'" *Id*. (quoting *Justus v. Commonwealth*, 222 Va. 667, 678 (1981)).

8

Code § 18.2-119 makes it a criminal offense for "any person without authority of law" to "remain[] upon the lands, buildings or premises of another . . . after having been forbidden to do so." However, "one cannot be convicted of trespass when one enters or stays upon the land under a bona fide claim of right." *Reed v. Commonwealth*, 6 Va. App. 65, 71 (1988) (citing *Wise v. Commonwealth*, 98 Va. 837 (1900)); *see also Commonwealth v. Hicks*, 267 Va. 573, 583 (2004) (citing *Reed* and noting that Code § 18.2-119 requires proof of criminal intent).

"[A] bona fide claim of right is a sincere, although perhaps mistaken, good-faith belief that one has some legal right to be on the property." *Id.* "The claim need not be one of title or ownership, but it must rise to the level of authorization." *Id.* Thus, a good faith defense requires more than abstract good faith; it requires a good-faith belief, supported by objective facts that, if true, rise to the level of being an authorization to enter or remain on the premises.

Therefore, to be entitled to an instruction on the claim-of-right defense, Kartozia was required to present evidence that he possessed a genuine, good-faith belief, supported by purported objective facts, that he was authorized to remain on the Turnberry Tower property on the evening in question. There is no evidence of purported objective facts, or even inferences from purported objective facts, which support Kartozia's assertion that he had a reasonable, good-faith belief that he was authorized to remain on the premises after being warned to leave and making no effort whatsoever to contact Yang.

Apart from statutory exceptions, legal authorization to enter or remain on private property requires permission from the property "owner, lessee, custodian or the agent of any such person, or other person lawfully in charge thereof"—the same individuals with authority to exclude one from private property. Code § 18.2-119. Even assuming, *arguendo*, that Kartozia actually and sincerely believed that he had some legal right to remain on the premises of

9

Turnberry Tower simply because he knew Yang lived in the building, a sincere belief alone is not sufficient to create a bona fide claim of right. To do so, Kartozia was additionally required to present evidence that his claim of right amounted to, at minimum, a facially valid authorization. He did not do so. The record is devoid of any evidence that anyone with the power to authorize Kartozia to remain on the premises had authorized him to do so.

Likewise, it is of no consequence that Kartozia believed he was entitled to do as he pleased on what he knew to be private property because he "knew [he] was there for Phil." Kartozia's source of authorization cannot be himself. As the circuit court rightly concluded, the fatal flaw in Kartozia's claim of right defense is that "the one person who could have given authorization had no idea that [] Kartozia was on the property" because of Kartozia's unwavering refusal to make Yang aware of his presence.

There is no dispute as to Turnberry Tower's standard operating procedure for residents' guests. Visitors are to arrive at the main entrance and check in with the concierge, who will contact the host resident. Kartozia followed this procedure during previous visits to Yang; there was no testimony that Kartozia had ever used an entrance other than the front entrance when visiting Yang. On the night in question, however, Kartozia did not use the front entrance, did not check-in with the concierge, and did not ask the concierge to contact Yang. Instead, building security discovered Kartozia alone in the rear garden area of the building. Additionally, Kartozia did not inform security staff that he was there to visit Yang—only that he *knew* Yang.

Kartozia testified that he could show up unannounced and tell Yang "I'm here." That fact and others support the conclusion, verified by Yang, that Kartozia was authorized to enter the Turnberry Tower property and notify Yang of his arrival—but the propriety of his entry onto the property is not at issue in this case. The relevant issue in this instance concerns Kartozia's

10

purported good faith belief that he was authorized to remain on the property after he was told to leave by agents of the owner.

Yang testified that visitors must be accompanied by a resident and are not allowed to "wander around" the property unescorted. Kartozia had never been authorized to spend time enjoying the amenities on the Turnberry Tower property unaccompanied by a resident, nor had he ever done so prior to the night in question. There is no evidence in the record that would support the proposition that Kartozia had any good faith belief that he was authorized to remain on the property after being asked to leave by authorized agents of the owners.

While there is no evidence that Kartozia had a good faith belief that he was permitted to remain in the back of Turnberry Tower in the middle of the night, unaccompanied by a resident, there is ample evidence in the record that Kartozia was affirmatively and repeatedly told that he was *not permitted* to do that. Security staff and law enforcement clearly informed Kartozia that he was on private property; he was not permitted to "just loiter" and "stand around"; and he needed to leave the premises *unless* he was (1) there to see a resident, (2) the resident was contacted, and (3) the resident came to claim Kartozia as a guest. Even if the testimony of the security staff and Officer Reed could be read as "conditional" directives (as the Court of Appeals determined), Kartozia did not meet the conditions expressed in such directives. Kartozia refused multiple offers by security staff to contact a resident, Kartozia refused to personally contact Yang, and Yang never claimed Kartozia as his authorized guest that night.

Moreover, Officer Reed testified that police officers instructed Kartozia to leave the premises "six or seven times," but Kartozia refused. There is nothing conditional about six or seven directives by law enforcement to leave private property. Even if Kartozia sincerely believed that he was authorized to enter the premises, any belief that he was authorized to remain

11

there should have immediately dissipated once police officers instructed him that he was breaking the law and would be arrested if he did not leave.

The record amply demonstrates that Kartozia was given a multitude of opportunities to course-correct but preferred being arrested over complying with the lawful directives of security staff and police officers. Rather than accepting any of the offers by security staff to contact a resident for him, and rather than dialing Yang himself with his own phone that had been charging for approximately an hour and a half, Kartozia refused to contact Yang. The undisputed facts point to the unavoidable conclusion that Kartozia's purported belief in a right to remain on the premises is so unreasonable that it must be either the product of disingenuousness or remarkable folly.

Kartozia's assertion that security staff could have and should have called Yang is not beneficial to Kartozia's assertion that he had a good-faith claim which authorized him to remain on the property. Security staff and police officers did not have an obligation to call Yang in the middle of the night to inquire whether Yang knew Kartozia and would authorize him to visit that night. Indeed, it would have been objectively unreasonable for security staff to have done so under the circumstances, when Kartozia was found at the back of the building rather than the main entrance, failed to accept multiple offers to contact Yang, and was perceived by security staff and law enforcement as behaving in an unusual and contentious manner.

The record demonstrates that the circuit court was aware of the minimum threshold for granting a proposed instruction, and that the circuit court, after assessing the evidence and giving the parties ample opportunity to proffer additional evidence, determined that the threshold was not met regarding Instruction H. There is no evidence that Kartozia harbored a good-faith belief that he was entitled to remain on the Turnberry Tower property, and, even if his belief in a claim

12

of right was sincere, the objective facts, which Kartozia purportedly relied upon for his good faith claim, did not rise to the level of being an authorization for him to remain on the property. Thus, the circuit court did not abuse its discretion by determining that Kartozia's proposed instruction regarding a good-faith claim-of-right defense was not supported by more than a scintilla of credible evidence.[*]

## III. CONCLUSION

Even viewing the evidence in the light most favorable to Kartozia, we conclude that Kartozia's proposed instruction on the claim-of-right defense was not supported by any credible evidence. As noted by the circuit court, Instruction H only applied to Kartozia's right to enter the property, which was not at issue. Further, there was no evidence that Kartozia's belief that he was entitled to remain on the Turnberry Tower premises, after being directed to leave by security and police officers, was supported by objectively reasonable facts, such that the belief might have been held sincerely and in good faith. Even if Kartozia's claim was sincere, it was not based on a facially valid authorization to remain on the premises. The circuit court's

---

[*] We endeavor to resolve cases on the best and narrowest grounds available. *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020). Given our resolution of the Commonwealth's assignments of error regarding Instruction H, we need not address application of harmless error in this instance. However, we note that "[i]n this court the doctrine of harmless error has been frequently announced and enforced in many cases where there has been a misdirection of the jury, [and] a refusal to grant proper instructions." *Std. Paint Co. v. E. K. Vietor & Co.*, 120 Va. 595 (1917). *See also, e.g.*, *Pugsley v. Privette*, 220 Va. 892, 902 (1980) (finding any error in giving an "abandonment" instruction to be harmless because the jury found for the defendant on negligence); *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 43–44 (2006) (determining that failure to instruct the jury on the issue of qualified privilege was harmless error because the privilege would have been lost upon jury's finding of actual malice); *Velasquez v. Commonwealth*, 276 Va. 326, 330–31 (2008) (finding error of granting a jury instruction was harmless due to the overwhelming evidence of defendant's guilt); *Swinson v. Commonwealth*, Record No. 230173, 2024 Va. Unpub. LEXIS 2, at *5 (Feb. 1, 2024) (determining that any error in excluding some factors from a proffered jury instruction was harmless given the overwhelming evidence of defendant's guilt).

decision to deny Instruction H was not an abuse of discretion.  We hold that the Court of Appeals erred in concluding otherwise.  Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court.

*Reversed and final judgment.*