## Richmond

MARY LOUISE McCLUNG v. COMMONWEALTH
OF VIRGINIA.

March 10, 1975.

Record No. 740418.

Present, All the Justices.

*Fred A. Talbot (James A. Baber, III; Bremner, Byrne & Baber*, on brief), for plaintiff in error.

*Gilbert W. Haith, Assistant Attorney General (Andrew P. Miller, Attorney General*, on brief), for defendant in error.

Poff, J., delivered the opinion of the court.

The trial court entered judgment on the jury's verdict convicting Mary Louise McClung of murder in the second degree and sentencing her to five years in the penitentiary. The jury heard instructions on first degree murder, second degree murder, and self-defense. The sole question before us is whether the trial court erred in refusing to grant an instruction on voluntary manslaughter requested by the defendant.

Defendant testified that she and her "boss", Richard Davis, had been engaged to be married for approximately two years; that Davis had struck her during public quarrels; that twice he had beaten her so severely that she required emergency hospital treatment; that he became violent when he had been drinking; that he had forced her to have sexual relations which she found distasteful; and that she had sought legal advice as to how she

could restrain him from harassing her. Learning that Davis had been "dating" another woman, defendant terminated the engagement in February, 1972.

Defendant testified that she decided to resign her job effective May 11, 1972. At the close of working hours that day, she returned to her apartment. Between 8:30 and 9:00 p.m., Davis entered through her front door. She said that the door had been locked and that she had not given him a key. Davis, who had been drinking, told her that he wanted to talk with her. She told him to leave. He said that he had come to make love to her and he intended to do so. When she refused, Davis seized her. As she struggled to break away, Davis grabbed her "around [her] legs and arms" and dragged her to the foot of the stairs leading to her bedroom. Defendant could recall nothing from that moment until she was placed in a police car.

Defendant's next door neighbor testified that, while watching a comedy program televised between 8:00 and 9:00 p.m., he heard gun shots. In less than three minutes, defendant appeared at his door and told him that "she needed to come in and call the police, she had just shot a man, or words to that effect." The neighbor said that defendant was wearing a dark dress, that he saw no marks or bruises on her body, that her hair was "neatly in place", and that "she didn't look like that she had been in-volved in any type of tussle to me, but I wasn't specifically look-ing for any hints that there was a tussle." He further testi-fied that she attempted unsuccessfully to reach an attorney by telephone, and that she told him that the man she had shot was her "boss" who had been "harassing [her] for a long time".

In response to the neighbor's telephone call, the first of three investigating officers arrived at 9:20 p.m. Davis's nude corpse was found lying on its back on defendant's bed. Two bullets had entered the body. A third had penetrated the pillow and mattress. A fourth had struck the wall above the bed. The absence of powder burns and the trajectories of the bullets indicated that all had been fired from a position near the bedroom door approximately eight feet from the body. Photographic exhibits showed some of Davis's clothing on a chair and some on the floor and his glasses on a bedside table. They also showed a woman's clothing on the floor. Following the defendant's directions, the officers found the pistol in a closet located in the hallway between the bedroom and a bathroom.

A gunsmith testified that the defendant bought the pistol on April 15, 1972; that she test-fired it in the range in his basement; that she handled it "in a safe manner and very good for a woman"; and that "she hit the target just about every time she fired." Defendant explained that she bought the gun after she discovered "that any one with a key to any other apartment in the project could enter any apartment he so choosed and I felt that it was no longer safe for me to live alone in that particular area."

Defendant further testified that the dress she was wearing when arrested was the same dress she had worn to work that day. She said that she did not notice whether it had been torn in the struggle, but if so it could have been mended by the laundress before she wore it again.

On appeal, the defendant concedes that the evidence viewed in the light most favorable to the Commonwealth was sufficient to support the jury's verdict. However, she argues that the evidence was also sufficient to support an instruction on voluntary manslaughter.

The Commonwealth concedes that there was some evidence of provocation but contends that there was no evidence that the provocation in fact engendered passion and no evidence that the defendant acted in the heat of passion.

As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice arising from a homicide is a question of fact. *Jacobs* v. *Commonwealth*, 132 Va. 681, 686, 111 S.E. 90, 92 (1922). Only when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that the minds of reasonable men could not differ does the question become a question of law. Subject to the same standards, it is also a question of fact whether the defendant committed the homicide before or after his passion had cooled. *Crockett* v. *Commonwealth*, 187 Va. 687, 697, 47 S.E.2d 377, 382 (1948).

We believe that the evidence of provocation was not incredible and that the minds of reasonable men could differ as to whether the provocation was sufficient to engender passion and as to whether passion had cooled. According to the defendant's testimony, all of which the jury might have believed, she had been medically treated for two beatings Davis inflicted upon her.

She explored the possibility of legal action against him. She broke their engagement. She quit her job. Later that night, Davis suddenly entered her apartment through a locked door. She knew that he had been drinking. When she refused his sexual demands, he seized her. By superior force, he overcame her struggles to escape and dragged her to the stairs leading to her bedroom. The jury could have believed that such circumstance indicated that he intended to rape her. Whether he accomplished that purpose, the defendant was unable to recall. Even if he did not, the jury could have concluded that his conduct under these circumstances was sufficient to provoke a reasonable person to fear or rage, or both. Passion, cast in the context of voluntary manslaughter, is not limited to rage. *See* 40 Am. Jur. 2d *Homicide* § 57 (351) (1968).

Having reached that conclusion, the jury could have turned to other testimony and to the physical evidence to determine whether the defendant killed Davis before her passion had cooled. The neighbor heard the shots before 9:00 p.m. If the jury believed the defendant's testimony that Davis arrived after 8:30 p.m., they could have concluded that the "cooling time" was less than half an hour. Finally, assuming the defendant's competence in the use of a pistol, the jury could have concluded that the number of bullets fired and the scattered pattern of their impact indicated that her reason had been dethroned and that her normal motor reflexes had been disrupted by the heat of her passion.

It is immaterial that the jury could have reached contrary conclusions. If a proffered instruction finds any support in credible evidence, its refusal is reversible error. *Taylor* v. *Commonwealth,* 186 Va. 587, 591, 43 S.E.2d 906, 908 (1947). *See also Painter* v. *Commonwealth,* 210 Va. 360, 171 S.E.2d 166 (1969). It is also immaterial that the jury did not believe that the defendant killed in self-defense as defined in the instruction they heard. "The plea of self-defense and of passion . . . are not in conflict with each other." *Wilkins* v. *Commonwealth,* 176 Va. 580, 583, 11 S.E.2d 653, 655 (1940). Had the jury been instructed in the definition of voluntary manslaughter, they could have found that the homicide met that definition. *See Belton* v. *Commonwealth,* 200 Va. 5, 104 S.E.2d 1 (1958).

The judgment is reversed and the case is remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*