COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Chaney and White
Argued by videoconference


AVERY D. KIRBY, S/K/A
 AVERY DEMETRIE KIRBY
                                                          MEMORANDUM OPINION* BY
v.      Record No. 1984-23-3                     JUDGE MARY BENNETT MALVEAUX
                                                                JULY 29, 2025
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                             James J. Reynolds, Judge

          Michael A. Nicholas (Daniel, Medley & Kirby, P.C., on brief), for
          appellant.

          Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
          Miyares, Attorney General, on brief), for appellee.


        Avery D. Kirby ("appellant") was convicted of second-degree murder, in violation of Code

§ 18.2-32.  On appeal, he contends that the trial court erred in refusing his proposed jury instructions

related to voluntary manslaughter.  Based on the record before us and the applicable legal

principles, we agree with appellant.  Accordingly, we reverse and remand for a new trial if the

Commonwealth be so inclined.

                                        BACKGROUND

        "When reviewing a trial court's refusal to give a proffered jury instruction, we view the

evidence in the light most favorable to the proponent of the instruction." *Pena Pinedo v.

Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33

(2002)).

_____

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

In February 2023, appellant and D.J.[1] had been dating for "[a] couple years." Appellant was released from Lunenburg Correctional Center on February 13, 2023. D.J., along with two other people, picked up appellant and brought him to Danville. On February 22, 2023, D.J. obtained a room at the Astoria Hotel in Danville.

At 3:00 a.m. on the morning of February 26, 2023, Bryan Whitehead visited D.J., his mother, at the hotel. Appellant was in D.J.'s room, and both he and D.J. were acting normally. Whitehead left the hotel around 4:00 a.m. and went home. Around noon, he called D.J., but his call went straight to her voicemail. When D.J. did not return Whitehead's call, Whitehead returned to the hotel in his car and honked his horn outside the door to his mother's room. Appellant opened the door and "peeked" his head outside. When Whitehead asked appellant where his mother was, appellant replied that she was with appellant's mother.

That same day, around 2:00 p.m., a hotel employee received a phone call asking him to check on a woman in Room 110. The employee went to that room, opened the door, and saw a woman and bloodstains on the wall; he then called police.

A police officer arrived at the hotel and went to Room 110 where he found a woman, later identified as D.J., on the couch. D.J. appeared to have suffered blunt force trauma to her face and head, and there was blood on her head and shoulder. Emergency medical responders arrived and confirmed that D.J. was dead. The medical examiner later identified the cause of D.J.'s death as "blunt force injuries to the head." D.J.'s left eye socket, left cheek bone, lower jawbone, and the bridge of her nose had been broken as a result of the attack.

Police observed blood spattered all over the hotel room, including on the walls and ceiling. A wooden leg from the room's sink counter had been removed and was "propped up against the side of the couch" where D.J. was found. The sink counter with the missing leg was

_____

[1] We use the victim's initials to protect her privacy.

located approximately 16 feet from D.J.'s body. Appellant's I.D. card was found on the sink counter.

Earlier that afternoon, appellant had called Justin Motley, his brother-in-law, and had asked for a ride. Motley left his home at around 1:20 p.m. and picked appellant up at an ABC store. Appellant had a bottle of vodka with him and was sipping from it. He asked Motley to drive to a hotel so he could get a room. After first visiting two other hotels, appellant asked Motley to drop him off at the Astoria. When they arrived at the Astoria, Motley did not drive into the parking lot because there were many police cars there. Motley asked if appellant still wanted to go to the Astoria after seeing the police cars, and appellant responded no. At some point, while the two men were driving to the various hotels, Motley brought up D.J., and appellant stated "that he was no longer dealing with the devil. We don't have to worry about the devil anymore."

After leaving the Astoria, Motley drove with appellant to another part of Danville to meet with Motley's wife. Motley privately told his wife to have someone check on D.J. because he "felt as though something wasn't right." He then left with appellant to find a hotel room for him, but instead ended up at appellant's mother's house. While outside the house, Motley's wife called him and told him that D.J. was dead. Motley asked appellant, "what did you do?," and appellant replied, "what are you talking about?" Motley told appellant, "You know you did something to that woman." Motley's wife told them that police were on their way to the home, and appellant walked away from his mother's house "out of the neighborhood."

Around 5:00 p.m. that day, a police officer found appellant walking down the street near his mother's house. Appellant was arrested, and on the way to the police station he told police that he had been staying at the Astoria for the past three days. After appellant arrived at the police station, he was interviewed by Sergeant A.D. Harn of the Danville Police Department.

During his interview, appellant initially told Harn that he had not been staying at the Astoria. Later, he said that he did not know D.J. and that she had "just purchased a room for him for a couple nights," that he had not been staying in her room, and that he and D.J. had not been in a romantic relationship. Appellant later admitted that he had been staying in D.J.'s room for two or three days and that they had been in an "on and off relationship for about four to five years."

Appellant told Harn that D.J. had been "fine" when he left the hotel, and also that he had not fought or argued with her. But appellant later admitted that D.J. had been "upset with him because he had been for days smoking cocaine" and that he and D.J. had argued before he went to sleep. He subsequently gave a different reason for the argument, stating that he and D.J. argued because "she was jerking his leg and always on his case and constantly nagging at him. Wanted to set him a curfew, and trying to be controlling of his life and he didn't want that."

While appellant initially told Harn that he had not hit D.J. during the argument, he later said that had he hit her with his fist two to three times. He also admitted using the wooden counter leg to strike D.J., stating that he had started by striking "her with [his] fist on the face" and then "grabbed the . . . leg" and told her "say it again." In response, "she said something else and snickered and that is when [he] struck her on the head." Appellant first told Harn that he had been unaware D.J. was dead while he was at the hotel, but later admitted that he had known she had died after he struck her two or three times with the wooden counter leg.

At trial, appellant testified in his own defense. He stated that the night prior to D.J.'s death, he had seen her smoking cocaine with several other people at the hotel. After the others left, D.J. and appellant argued when D.J. asked appellant where he was the prior Friday night, and appellant told her not to ask him questions because they were not in a relationship. Appellant testified that D.J. had been angry with him because he had "disappeared for several

days," during which he had been "at another hotel room in South Boston with another girl" using cocaine. After the argument, he drank a shot of vodka and then fell asleep around 4:00 a.m.

Appellant woke up around 1:00 p.m. that afternoon. He testified that when he woke up, his "butt was sore." D.J. was also in the room, "sitting the couch . . . and looking with a smirk on her face." Because his "butt was sore," he "could tell that something ha[d] happened to it." Appellant asked D.J., "you still up to the same shit from the last time ain't you?" D.J. replied, "Uh," and said this "with a smirk like it is going to happen every time." Appellant stated that D.J. had been "sitting there . . . she admitted she did it and she shook her head and like, Uh fixed your ass." He stated that he had been "rendered unconscious . . . by whatever [D.J.] puts in [his] food or drink." Appellant "kn[ew] that [he] had been violated" but did not know what D.J. had used to assault him. He also stated that he "kn[ew] he went to sleep and was fine and [he] woke up assaulted." He specifically testified that this was the "second time" this particular form of assault had occurred.

Appellant testified that after he realized D.J. had sexually assaulted him, he had "snapped." According to appellant, "it just happened so fast before [he] realized it right then [he] grabbed the stick and hit her. Hit away and that is what happened." Appellant stated that he had not thought about killing D.J. before doing so and that it had "just happened before [he] realized it"; he had not intended or planned to kill her. He further testified that he had not "mean[t] to," but this "devil of a woman ha[d] been on [his] head for five years . . . , putting stuff in [his] food, . . . putting drugs in [his] car and getting [him] locked up and . . . drug[ging] [him] by drink."

After he hit D.J., appellant did not call the police because he did not know that D.J. was dead. Additionally, the results of the attack seemed like a "nightmare" to appellant, and he was "trying to process it all," so he did not call 911. He explained that he had told Whitehead that

D.J. was with appellant's mother because appellant was "trying to wrap [his] brain around everything." Appellant admitted that he had told Motley that he "could not deal with the devil no more," and said that he had made that statement because every time he had tried to leave D.J., he ended up in jail because of "assault[]" or "drugs."

Appellant did not seek medical attention or have a forensic nurse examine him after the sexual assault. He stated that he had reported the abuse to his teenage nephew, but not to anyone else. Appellant testified that he did not tell police about the sexual assault "[b]ecause it was embarrassing to tell someone . . . what had happened, by this witch" who "ruled [him]." He testified that D.J. was a "snake" and "the wickedest woman that ever[] walked the face of God's earth that [he] ha[d] ever come in contact with."

Appellant further testified that he had taken the leg off the sink counter prior to his attack on D.J. because "when [D.J.] smoke[d] coke she like[d] something up against the door." He admitted that he had not told this to police, and instead had told them that he "ripped" off the wooden leg from the sink counter. He stated that much of what he had said in his police interview was not entirely true because he had been "just trying to avoid talking about the sexual assault part" and that he was "telling . . . the truth now." Appellant acknowledged that he had 17 prior felony convictions.

Appellant requested three jury instructions related to voluntary manslaughter.[2] The trial court refused the instructions on voluntary manslaughter, and instead provided the jury with

---

[2] The first was a finding instruction for voluntary manslaughter; the second was an instruction advising the jury that the difference between murder and manslaughter is malice; and the third was a waterfall instruction that included voluntary manslaughter. The Commonwealth does not contend that these instructions contained erroneous statements of law concerning voluntary manslaughter.

instructions on first-degree and second-degree murder. The jury convicted appellant of second-degree murder.

This appeal followed.

ANALYSIS

On appeal, appellant argues that the trial court erred in refusing to submit voluntary manslaughter instructions to the jury because his killing of D.J. was committed in the heat of passion upon reasonable provocation.

I. Standard of Review

"We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022). "A jury instruction is proper only when it is supported by 'more than a scintilla of evidence.'" *Pena Pinedo*, 300 Va. at 121 (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "If the instruction is not applicable to the facts and circumstances of the case, it should not be given." *Id.* at 122 (quoting *Sands*, 262 Va. at 729). "Thus, it is not error to refuse an instruction when there is no evidence to support it." *Id.* (quoting *Sands*, 262 Va. at 729).

"This Court reviews the record to determine whether there was more than a scintilla of credible evidence in support of the proponent's jury instruction." *Woods v. Commonwealth*, 66 Va. App. 123, 130 (2016). "Although [the term 'scintilla'] has a generally accepted meaning of 'a spark' or 'the least particle,' *see, e.g.*, *Black's Law Dictionary* 1345 (6th ed. 1990), the precise limitations of this term must necessarily be determined in the factual context of a particular case." *Brandau v. Commonwealth*, 16 Va. App. 408, 411 (1993). In making that determination, we view the evidence in the light most favorable to the proponent of the instruction, *Pena Pinedo*, 300 Va. at 118, and if, when the evidence is viewed in that light, "a proffered instruction finds any support in credible evidence, its refusal is reversible error[,]" *Davis v. Commonwealth*,

68 Va. App. 725, 731 (2018) (quoting *McClung v. Commonwealth*, 215 Va. 654, 657 (1975)).

"[W]e have rejected the concept that a jury instruction on the lesser-included offense must

always be given." *Vaughn*, 263 Va. at 35. But "the defendant is entitled to an instruction for a

lesser-included offense if a jury could 'rationally find the defendant guilty of the lesser offense

yet acquit him of the greater.'" *Dandridge v. Commonwealth*, 72 Va. App. 669, 680 (2021)

(quoting *Edwards v. Commonwealth*, 65 Va. App. 655, 663 (2015)). "If any credible evidence in

the record supports a proffered instruction on a lesser included offense, failure to give the

instruction is reversible error." *Brandau*, 16 Va. App. at 411 (quoting *Boone v. Commonwealth*,

14 Va. App. 130, 132 (1992)). And, accordingly, if the "evidence tends to sustain both the

prosecution's and the defense's theory of the case, the trial judge is required to give requested

instructions covering both theories." *Diffendal v. Commonwealth*, 8 Va. App. 417, 422 (1989).

## II. Voluntary Manslaughter

Here, appellant was convicted of second-degree murder, which is defined as a malicious

killing. *Woods*, 66 Va. App. at 131. "Voluntary manslaughter is a lesser-included offense of

second-degree murder." *Dandridge*, 72 Va. App. at 680. Like the various categories of murder,

voluntary manslaughter is "an intentional killing." *Turner v. Commonwealth*, 23 Va. App. 270,

274 (1996). But it is distinguished from murder in that voluntary manslaughter occurs in the

absence of malice. *Barrett v. Commonwealth*, 231 Va. 102, 105 (1986). "Malice is evidenced

either when the accused acted with a sedate, deliberate mind, and formed design, or committed

any purposeful and cruel act without any or without great provocation." *Branch v.

Commonwealth*, 14 Va. App. 836, 841 (1992).

In contrast with a malicious killing, this Court has defined voluntary manslaughter as "the

unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or

upon a sudden provocation, and without any previous grudge, and the killing is from the sudden

heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Woods*, 66 Va. App. at 131 (quoting *Wilkins v. Commonwealth*, 176 Va. 580, 583 (1940)).  Stated another way, "[t]o reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation."  *Dandridge*, 72 Va. App. at 681 (alteration in original) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)).

"Heat of passion refers to the furor brevis which renders a man deaf to the voice of reason."  *Woods*, 66 Va. App. at 131 (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)).  "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both."  *Barrett*, 231 Va. at 106 (citation omitted).  It "requires the simultaneous 'reasonable provocation' by the victim and resulting passion by the defendant, such that the defendant acts 'on impulse without conscious reflection.'"  *Williams v. Commonwealth*, 64 Va. App. 240, 252 (2015) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)).  "As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice arising from a homicide is a question of fact."  *McClung*, 215 Va. at 656.  Accordingly, "[t]he determination of whether a killing is committed in pursuit of a continuing animus or upon reasonable provocation or whether it was accomplished maliciously or in the heat of passion is a jury question."  *Turner*, 23 Va. App. at 275.  However, "when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that minds of reasonable men could not differ . . . the question become[s] a question of law."  *McClung*, 215 Va. at 656.

### III.  Trial Court Erred in Refusing Voluntary Manslaughter Instruction

Here, the question before us is not whether appellant acted without malice in his killing of D.J. and thus committed voluntary manslaughter as opposed to second-degree murder. Instead, the sole issue we must decide is whether the trial court erred in not giving the requested

voluntary manslaughter instructions. Based on the standard of review and applicable legal standards recited above, we conclude that the trial court erred in refusing these instructions because there was more than a scintilla of evidence that appellant acted in the heat of passion upon reasonable provocation, and thus acted without malice.

At trial, appellant testified as to his version of the events leading to D.J.'s death. According to appellant, on the night prior to D.J.'s death, D.J. and appellant argued because appellant had recently spent time with another woman. In retaliation for appellant's infidelity, D.J. sexually assaulted appellant in his buttocks area while he slept. After he woke up and realized that he had been sexually assaulted, appellant spoke briefly with D.J., asking her if she had sexually assaulted him. Once he got confirmation of the assault, he then "snapped," and hit her with the wooden leg of the sink counter, causing D.J.'s death. Appellant did not intend or plan to kill her. Viewed in the light most favorable to appellant, in killing D.J., appellant acted upon a reasonable provocation—D.J.'s sexual assault of him. He also acted in the heat of passion, rendered "deaf to the voice of reason," *Woods*, 66 Va. App. at 131 (quoting *Rhodes*, 41 Va. App. at 200), by his rage toward D.J.

The Commonwealth, however, argues that there was not more than a scintilla of evidence to support the instructions addressing voluntary manslaughter. In support of this contention, it asserts that appellant's version of events lacked credibility because he failed to tell the investigator about the sexual assault during his police interview, did not wake up during or later seek medical attention for the assault, and failed to give aid to D.J. or call 911 on her behalf. But these challenges to appellant's account of D.J.'s death do not make the determination of whether he acted in the heat of passion upon reasonable provocation a question for the trial court instead of the jury. As noted above, "[a]s a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice

- 10 -

arising from a homicide is a question of fact" for the jury. *McClung*, 215 Va. at 656. "Only when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that minds of reasonable men could not differ does the question become a question of law." *Id.* Here, we cannot say that the minds of reasonable persons could not differ in disbelieving appellant's account due to his failure to tell police about the assault, his lack of waking up or obtaining treatment for the assault, or his failure to obtain help for D.J. Instead, these were credibility issues that were for the jury to decide, not for the trial court to resolve.[3] "The credibility of [appellant's] story was for the jury to determine in the light of all the other evidence, and he was entitled to have his version of the evidence presented to them under a proper instruction or instructions." *Spear v. Commonwealth*, 213 Va. 599, 601 (1973) (holding that the trial court erred in not giving a justifiable homicide instruction when "[t]he refused instruction was predicated upon defendant's evidence and was a correct statement of the law"); *see also Lienau v. Commonwealth*, 69 Va. App. 254, 268 (2018) (reversing a trial court's refusal to give a self-defense instruction and noting that "it was for the jury to determine how the events reasonably appeared to [the defendant] and what weight to give [the defendant's] statements to police"), *aff'd upon rehearing en banc*, 69 Va. App. 780 (2019).

In addition, as noted by the Commonwealth, "'[t]he weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." *Lienau*, 69 Va. App. at 264 (second alteration in original) (quoting *King v.*

---

[3] We emphasize that our conclusion is not predicated on the actuality that the jury *would* have found that appellant acted in the heat of passion upon reasonable provocation. The jury could have reasonably rejected appellant's version of events and convicted him of an offense other than voluntary manslaughter. But because this decision was one for the jury, and not this Court, we do not opine on the credibility of appellant's account and instead only hold that the trial court erred in not instructing the jury on the legal principles related to voluntary manslaughter.

*Commonwealth*, 64 Va. App. 580, 587 (2015) (en banc)).  It is also true that while a defendant's uncorroborated testimony "may amount to more than a scintilla of evidence when viewed in a vacuum," it often "pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." *Brandau*, 16 Va. App. at 413.  Here, the other undisputed evidence at trial included the physical evidence that D.J. suffered blunt force trauma to her face and head, and had blood on her head and shoulder; there was blood spattered all over the hotel room, including on the walls and ceiling; and a wooden leg had been removed from the sink counter and was "propped up against the side of the couch where [D.J.] was" found.  None of this physical evidence contradicted appellant's theory of D.J.'s killing—that he hit her with the wooden counter leg after he "snapped" because she had sexually assaulted him.[4]  Because it was for the jury to determine the credibility of appellant's account of D.J.'s death, and because no credible physical evidence negated appellant's theory, we reject the Commonwealth's argument that the trial court did not err in refusing to give voluntary manslaughter instructions based on the lack of credibility of appellant's theory of the case.

The Commonwealth also argues that voluntary manslaughter instructions should not have been given here because "there was reasonable time or opportunity for any passion to cool."

---

[4] In other cases where Virginia appellate courts have found that credible evidence negated a defendant's theory of the case, and thus refusal of a jury instruction for a lesser-included offense was not erroneous, the physical evidence itself demonstrated that the defendant's theory was without a scintilla of evidence to support it. *See, e.g.*, *Woods*, 66 Va. App. at 133 (refusing a jury instruction for the lesser-included offense of voluntary manslaughter was not error when there was "affirmative physical evidence in the record that belie[d] [the defendant's] testimony that he was not trying to 'purposefully kill [the victim]' and that he was 'just trying to get out of there'" (third alteration in original)); *Commonwealth v. Leal*, 265 Va. 142, 147 (2003) (refusing a jury instruction for a lesser-included offense of assault or battery by mob was not error because "[t]he undisputed evidence of the victim's massive injuries [was] inconsistent with defendant's version of the facts and his claim that he only intended to act as an arbiter during the affray"); *Brandau*, 16 Va. App. at 411-13 (refusing a jury instruction for the lesser-included offense of assault and battery was not error when physical evidence contradicted defendant's testimony that he only intended to shoot in an attempt to scare away the individual at the door).

"Heat of passion requires the simultaneous 'reasonable provocation' by the victim and resulting passion by the defendant, such that the defendant acts 'on impulse without conscious reflection.'" *Williams*, 64 Va. App. at 252 (quoting *Graham*, 31 Va. App. at 671). "The law requires the *simultaneous occurrence* of both reasonable provocation and passion." *Graham*, 31 Va. App. at 671 (emphasis added). "If [the Commonwealth] demonstrates that the accused reflected or deliberated, that his passion cooled, or that there was reasonable time or opportunity for cooling, then the [offense] is attributable to malice and not heat of passion." *Miller v. Commonwealth*, 5 Va. App. 22, 25 (1987).

Here, appellant initially told police that he "ripped" off the wooden leg from the sink counter and then struck D.J. on the head with it. The sink counter was approximately 16 feet from the couch where D.J. was sitting when appellant struck her. At trial, appellant testified that he had already removed the counter leg prior to his attack on D.J. because she "like[d] something up against the door" while she smoked cocaine. In either case, the Commonwealth argues that appellant had to retrieve the counter leg that he used to beat D.J., thus refuting his claim that he acted "on impulse without conscious reflection." *Williams*, 64 Va. App. at 252 (quoting *Graham*, 31 Va. App. at 671).

For the same reason that we reject the Commonwealth's argument concerning the credibility of appellant's account, we find no merit in its contention that the evidence that appellant had to retrieve the counter leg supports the trial court's decision to refuse voluntary manslaughter instructions. Just as whether a provocation was sufficient to rebut the presumption of malice is a question of fact, "it is also a question of fact whether the defendant committed the homicide before or after his passion had cooled." *Miller*, 5 Va. App. at 25 (quoting *McClung*, 215 Va. at 656). Further, "[o]nly when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that the minds of reasonable men could not

- 13 -

differ does the question become one of law." *Id.* (quoting *McClung*, 215 Va. at 656). Here, reasonable persons could differ as to whether appellant's retrieval of the counter leg provided him with sufficient time to cool off and thus act with malice rather than passion. While appellant provided different accounts as to when he removed the leg from the sink counter, he consistently stated that he grabbed the leg, spoke briefly to D.J., and then struck her on her head with it. And the counter leg was located inside the hotel room, meaning appellant did not leave the immediate area to obtain the item he used as a weapon. Because we cannot say reasonable persons could not differ as to whether appellant had a sufficient cooling off period, this question was one for the jury. Accordingly, the evidence of appellant having to retrieve the counter leg does not support the Commonwealth's argument that the trial court did not err in refusing appellant's proposed voluntary manslaughter instructions.[5]

"[A] trial court must instruct the jury on the lesser-included offense of voluntary manslaughter if the evidence of heat of passion and reasonable provocation amounts to 'more than a scintilla.'" *Dandridge*, 72 Va. App. at 682 (alteration in original) (quoting *Turner*, 23 Va. App. at 275). "It is immaterial that the jury could have reached contrary conclusions. If a proffered instruction finds any support in credible evidence, its refusal is reversible error." *Id.* (quoting *McClung*, 215 Va. at 657). In the instant case, viewing the evidence in the light most

---

[5] As noted above, voluntary manslaughter is defined as "the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Woods*, 66 Va. App. at 131 (quoting *Wilkins*, 176 Va. at 583). The Commonwealth argues that, because appellant testified that D.J. had previously sexually assaulted him, his killing of D.J. was the result of a "previous grudge" that did not "grow[] solely" out of the February 26, 2023 sexual assault. But this argument again fails to acknowledge that this question was a factual one for the jury to decide. "The determination of whether a killing is committed in pursuit of a continuing animus or upon reasonable provocation . . . is a jury question." *Turner*, 23 Va. App. at 275. Thus, on appeal, we cannot say that the trial court's refusal to give voluntary manslaughter instructions was not erroneous based on appellant's testimony regarding D.J.'s previous sexual assault.

favorable to appellant, his account of D.J.'s killing provided credible evidence that he acted in the heat of passion upon reasonable provocation. Accordingly, the trial court erred by refusing the requested voluntary manslaughter instructions.

## IV. Harmless Error

The Commonwealth further argues that any error in the trial court's denial of the voluntary manslaughter instructions was harmless.

A non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." *Turman v. Commonwealth*, 276 Va. 558, 567 (2008) (quoting Code § 8.01-678). "An error is harmless 'if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same.'" *Turner*, 23 Va. App. at 275 (quoting *Davies v. Commonwealth*, 15 Va. App. 350, 353 (1992)). "Virginia law requires that in all criminal cases in which the appellate court finds that error occurred in the trial court, it must consider whether the error was harmless." *Graves v. Commonwealth*, 65 Va. App. 702, 711 (2016). "[W]here it is impossible to determine from the verdict whether the jury would have necessarily rejected a lesser-included offense on which it was not instructed, error in refusing to instruct on that offense is not harmless." *Dandridge*, 72 Va. App. at 685 (alteration in original) (quoting *Lienau*, 69 Va. App. at 270).

The Commonwealth contends that any error in not giving the voluntary manslaughter instructions was harmless because the evidence of appellant's "guilt of a malicious killing was overwhelming." The Commonwealth highlights evidence that appellant: beat D.J. to death with a wooden counter leg, striking her with enough blows to break her eye socket, cheek bone, lower jawbone, and the bridge of her nose; did not call for an ambulance or render aid to D.J.; told a

series of lies to police about not knowing D.J. or the circumstances of her death; and expressed his hatred of D.J. to others, including the jury, by referring to her as a "snake" and "the devil."

Taking this evidence into account, we still cannot say "that, had the error not occurred, the verdict would have been the same." *Turner*, 23 Va. App. at 275 (quoting *Davies*, 15 Va. App. at 353). Although there was evidence supporting the Commonwealth's theory of a malicious killing, there was also evidence supporting appellant's theory of a killing committed in the heat of passion upon reasonable provocation. Because "it is impossible to determine from the verdict whether the jury would have necessarily rejected a lesser-included offense on which it was not instructed," we find the "error in refusing to instruct on that offense . . . not harmless." *Dandridge*, 72 Va. App. at 685 (quoting *Lienau*, 69 Va. App. at 270).

CONCLUSION

Viewing the facts in the light most favorable to appellant, the proponent of the voluntary manslaughter jury instructions, there was credible evidence to support appellant's theory that his killing of D.J. was provoked by anger resulting from her sexual assault on him. The trial court thus erred in refusing to instruct the jury on voluntary manslaughter as appellant requested, as it was the jury's purview to determine if the killing was committed with malice or in the heat of sudden passion. Accordingly, we reverse appellant's conviction and remand for a new trial if the Commonwealth be so inclined.

*Reversed and remanded.*