COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia


PATRICK LYNN PIERCE, III
                                          MEMORANDUM OPINION* BY
v.        Record No. 0517-24-2               JUDGE STUART A. RAPHAEL
                                            SEPTEMBER 30, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
John Marshall, Judge

John W. Parsons for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Patrick Lynn Pierce fatally shot his wife. Following a jury trial, the trial court convicted

him of first-degree murder and using a firearm to commit murder. On appeal, Pierce contends

that the trial court erred by refusing his jury instruction on the defense of "accident." Because

the trial court correctly found that the evidence of accident was insufficient to support an

accident instruction, we affirm Pierce's convictions.

                              BACKGROUND

We usually review the evidence in the light most favorable to the Commonwealth when,

as here, it was the prevailing party below. But when "reviewing a trial court's refusal to grant a

proffered jury instruction, we examine the evidence in the light most favorable to the proponent

of the instruction." *Commonwealth v. Kartozia*, ___ Va. ___, ___ (June 5, 2025) (quoting

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

*Honsinger v. Egan*, 266 Va. 269, 274 (2003)).  So we recite the facts in the light most favorable to Pierce.

Just after 2:00 p.m. on November 29, 2021, Pierce called 911 to report that he had killed his wife, S.P.[1]  Pierce told the 911 operator, "I would like to report a murder.  I shot my wife." The operator asked Pierce for an address.  Audibly upset, Pierce stated again, "I killed my wife, I killed my wife.  Come get me."  When the operator asked for his name, Pierce said, "My name is Patrick, I killed my wife."  Just before the called ended, Pierce said, "I know I fucked up.  I'm done."

Officers arrived at Pierce's apartment complex shortly after the call.  S.P.'s Toyota Camry was in the parking lot with its doors open and engine running, but it was unoccupied. When officers entered Pierce's apartment, they found S.P. on the kitchen floor with a gunshot wound to her head.  Pierce (who had briefly fled the scene) approached the officers "sobbing" with "his hands in the air."  He was immediately detained.

Pierce spoke with Special Agent Christopher Henry in a patrol car outside the apartment.[2]  Pierce said that he and S.P. had three children together, but their marriage was failing.  Usually when "things got bad," S.P. would "leave for a week then come back."  But the couple's most recent squabble was different.  This time, S.P. did not come back; she started seeing someone else.

Pierce said that S.P. had come to his apartment to retrieve their son's laptop, which their son needed for school.  To Pierce's surprise, S.P. brought a friend with her.  S.P. typically "came alone or with her parents."  Pierce thought, "she really must be done with me."

---

[1] We omit the victim's name to protect the family's privacy.

[2] At the start of the interview, Henry read Pierce the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).

Pierce described the "altercation" that ensued. He grabbed S.P. from her vehicle and pulled her to the ground. S.P.'s friend, Chrishonda Morris, fled from the vehicle; Pierce assumed that she would call the police. Pierce directed S.P. into his apartment, taking her to the kitchen where his gun lay on top of the utensil drawer. Pierce admitted that S.P. had "marks on her neck" from his yanking her out of the car.

Pierce asked S.P. with whom she had been texting, demanding the passcode to her phone. He acknowledged to Henry, "it was just a jealous thing I did." S.P. told Pierce that she had been unfaithful in their marriage—something she had never said before.

Pierce admitted that he "took [the gun], I cocked it back, and . . . shot her." Henry asked if Pierce aimed the gun at S.P. Pierce replied that he was "aiming the gun up top to scare her." He then fled the apartment when S.P. fell to the floor. Pierce made two phone calls: one to his mother, the other to police. He ran to a nearby 7-Eleven "to get [his] last beer" and "black and mild" because he knew he was "never going to come out here" anymore. Pierce told Henry: "all I know is I fucked up."

Pierce was tried before a jury in July 2023. Pierce's 911 call and interview with Henry were played for the jury. Information from Pierce's cellphone was also introduced, revealing Pierce's text messages on the day he killed S.P. Between 1:23 p.m. and 2:19 p.m., Pierce was texting with his mother. At 1:49 p.m., his mother wrote, "I don't like how u are talking." Eleven minutes later she said, "Please don't let the devil use u, pray over ur mind no woman is worth u lo[]sing ur freedom or ur life." Pierce replied, "Ok I won't." Around 2:14 p.m. Pierce texted his dad, "Love you dad I'm going to jail . . . I killed [S.P.]." Pierce also texted two other contacts that he was going to jail.

Detective Kevin Harver processed the crime scene. He retrieved a pistol from the living room floor and photographed a single bullet hole in the kitchen wall. The bullet hole was three-

and-a-half feet up from the floor. Harver extracted the bullet from the wall. Forensic analysis matched it to the firearm found on the floor.

Dr. Renee Robinson conducted S.P.'s autopsy and qualified as an expert in forensic pathology. She testified that S.P. was 5 feet, 3 inches tall and weighed 107 pounds. Robinson opined that S.P. was shot at close range because the wound was "surrounded by a black discoloration or a soot deposition." When "the end of the gun is close enough to the skin," its "burnt and unburned powder residues, soot, [and] hot gases" can "be deposited on the skin." By analyzing the entrance and exit wounds, Robinson concluded that the bullet's path through S.P.'s head was from back to front, "right to left and downward." Robinson concluded that S.P. died from the gunshot wound to her head.

Morris—S.P.'s friend who accompanied her to the apartment building—was the Commonwealth's last witness. She said that when they arrived, Pierce demanded to know the children's social security numbers. He became "aggressive" when S.P. said that she would text them to him. Pierce opened the left-rear passenger door and began strangling S.P. from behind. Then he opened S.P.'s driver's-side door, pulled her to the ground while she was still in her seatbelt, and strangled her. Morris fled to call 911. Pierce called after her, "you might as well call the police because she's going to be gone anyway." Morris told the 911 operator that she ran away because she did not want to be killed.

Pierce moved to strike the Commonwealth's evidence, arguing that the prosecution failed to prove "premeditation, intent, or malice." The trial court denied the motion.

The defense called Pierce's mother, who testified that Pierce did not "have any reputation of violence" in his community. She explained her text message to Pierce about not "letting the devil" use him and that "no woman is worth losing your freedom or your life." She said that Pierce and S.P. had "argued a lot. And I was not there to stop the arguments as it took place.

- 4 -

And if he put his hands on her any kind of way, I knew he would be going to jail. That's what I meant." Pierce did not testify. The trial court denied his motion to strike at the close of all evidence.

At the charging conference, Pierce requested the following jury instruction on the defense of accident:

> Where the defense is that the killing was an accident, the defendant is not required to prove this fact. The burden is on the Commonwealth to prove beyond a reasonable doubt that the killing was not accidental. If after considering all the evidence you have a reasonable doubt whether the killing was accidental or intentional, then you shall find the defendant not guilty.

He argued that an accident instruction was warranted because of his statement to Special Agent Henry that he "intended to scare" S.P. by shooting "up top." The Commonwealth objected, arguing that the statement did not amount to a "scintilla of evidence" because "every other bit of evidence . . . showed that the killing was intentional." The trial court agreed and refused the instruction.[3] The jury found Pierce guilty of first-degree murder and using a firearm to commit murder.

The trial court sentenced Pierce to life in prison on the first-degree murder charge and imposed a three-year mandatory sentence on the firearm charge. It imposed an additional three years' incarceration on each charge, all suspended. Pierce noted a timely appeal.

ANALYSIS

Pierce argues that the trial court erred by refusing to instruct the jury on his accident defense. Our standard of review when "the trial court refuses a jury instruction is well-established." *Lienau v. Commonwealth*, 69 Va. App. 254, 263 (2018). Generally "the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *King v.*

---

[3] The trial court instructed the jury on first-degree and second-degree murder, as well as voluntary manslaughter.

*Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc) (alterations in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). We review such decisions for abuse of discretion. *Lienau*, 69 Va. App. at 263-64. But when a jury instruction involves a question of law, we apply de novo review. *Woods v. Commonwealth*, 66 Va. App. 123, 130 (2016). Our role "in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues [that] the evidence fairly raises." *Id.* (first alteration in original) (quoting *Cooper*, 277 Va. at 381).

If the evidence supports "the defendant's theory of defense, the trial judge may not refuse to grant a proper, proffered instruction." *Lienau*, 69 Va. App. at 264 (emphasis omitted) (quoting *King*, 64 Va. App. at 587). Where "a proffered instruction finds any support in credible evidence, . . . its refusal is reversible error." *King*, 64 Va. App. at 587 (quoting *McClung v. Commonwealth*, 215 Va. 654, 657 (1975)).

Pierce argues that he produced at least a scintilla of evidence in support of his accident theory. He relies on *King* and on *Martin v. Commonwealth*, 218 Va. 4 (1977) (per curiam). But those cases are distinguishable because the defense in both cases offered significant evidence to support the proffered instruction, something that Pierce failed to do here.

King and her husband offered different accounts about how King shot him. *King*, 64 Va. App. at 584-85. The husband testified that he awoke after King shot him in the arm; he locked himself in the bathroom until King left the house. *Id.* at 584. King testified that she was going to commit suicide, that her husband thwarted her plan, and that the gun discharged accidentally when he tried to disarm her. *Id.* at 584-85. The trial court denied King's request for an accident instruction. We reversed the conviction and remanded the case for a new trial, holding that King's accident theory was supported by more than a scintilla of the evidence and would have entitled her to an acquittal if believed by the jury. *Id.* at 591-92. Denying the

accident instruction created "jury confusion and misunderstanding" because the jury had "not otherwise been instructed that it [was] the Commonwealth's burden to disprove the defendant's theory beyond a reasonable doubt." *Id.* at 591.

In *Martin*, the defendant told the police and testified consistently at trial that he had accidentally shot the victim "as he was attempting to 'break the gun down' to determine if it was loaded." 218 Va. at 5. The Court held that Martin was entitled to an accident instruction because, "from the defendant's statement to the police and his testimony at trial, the jury could have found that the killing . . . was accidental." *Id.* at 6.

In contrast to the defense evidence in *King* and *Martin*, Pierce's stray comment to Special Agent Henry was insufficient to warrant an accident instruction because it was eclipsed by the mountain of evidence showing that Pierce intentionally shot S.P. "Although a defendant 'is entitled to an instruction upon his theory of the case,' this rule can be invoked '[o]nly when such instruction is supported by some appreciable evidence.'" *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015) (alteration in original) (emphasis omitted) (quoting *Harris v. Commonwealth*, 134 Va. 688, 695 (1922)). The instruction "must be supported by more than a mere scintilla of evidence." *Brandau v. Commonwealth*, 16 Va. App. 408, 411 (1993) (quoting *Boone v. Commonwealth*, 14 Va. App. 130, 132 (1992)). We have "avoided establishing a precise definition for the term 'scintilla' because to do so would be 'neither practical nor helpful.'" *Williams*, 64 Va. App. at 247 (quoting *Brandau*, 16 Va. App. at 411). "[T]he precise limitations of [that] term must necessarily be determined in the factual context of a particular case." *Brandau*, 16 Va. App. at 411.

The defendant in *Brandau* requested an assault-and-battery instruction as a lesser-included offense to the charge of attempted capital murder of a police officer. 16 Va. App. at 409. Brandau had repeatedly shot at a deputy sheriff who attempted to evict Brandau and his

wife. *Id.* at 410. Brandau testified that "his intent was to scare rather than to kill an intruder." *Id.* at 413. But Brandau's theory was heavily discredited by other evidence, including Brandau's earlier confession that he knew the deputy sheriff was outside before he grabbed his gun and started shooting through the door. The bullet holes in the door "were positioned to strike a person of average height standing on the outside of the door." *Id.* at 412. We said that while Brandau's testimony "may amount to more than a scintilla of evidence when viewed in a vacuum, . . . it pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." *Id.* at 413.

We followed that ruling in *Woods*, affirming the trial court's decision denying Woods's requested jury instructions on voluntary and involuntary manslaughter. Woods claimed that he was fearful and shooting aimlessly when he shot and killed the victim. 66 Va. App. at 128. We agreed with the trial court that Woods's testimony was "not supported by the undisputed physical evidence," which showed that Woods "exerted great care in aiming at the victim and in shooting him" ten times. *Id.* at 132.

*Brandau* and *Woods* control the outcome here. Although Pierce told Henry that he meant to "shoot up top" just to scare S.P., all the other evidence showed that he intentionally shot her. The very first thing that Pierce told the 911 operator was that he was calling "to report a murder." Pierce admitted he was jealous, and the evidence showed that he killed S.P. in a jealous rage. He knew their marriage was over when S.P., out of character, brought a friend to Pierce's apartment. He ripped S.P. from the car and strangled her, leaving noticeable marks on her neck. When S.P.'s friend fled the violent encounter, Pierce yelled after her, "you might as well call the police because she's going to be gone anyway." Once inside the apartment, Pierce searched through S.P.'s phone for evidence of infidelity. When S.P. admitted that she had cheated, Pierce grabbed his firearm, cocked it, and shot her in the head, killing her.

The head wound was "surrounded by a black discoloration or a soot deposition," corroborating that S.P. was shot at close range. The bullet took a downward trajectory, piercing the kitchen wall about three-and-a-half feet above the floor. The record shows that Pierce is six feet, five inches tall. S.P. was five feet, three inches tall. If Pierce had been shooting "up top" of S.P., the bullet would have not taken a downward trajectory.

"The more-than-a-scintilla requirement has teeth." *Rodrigue v. Butts-Franklin*, 79 Va. App. 645, 657 (2024). As in *Brandau* and *Woods*, Pierce failed to meet that requirement to justify his proffered instruction. Although Pierce's statement to Henry might have been sufficient when "viewed in a vacuum," it "pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." *Brandau*, 16 Va. App. at 413.

## CONCLUSION

In short, the trial court did not err by refusing the accident instruction.

*Affirmed.*